Bartley, C. J.,
dissenting.
After a full examination of this case, and patient con■sideration of the numerous interesting and complicated questions involved, I find myself differing so essentially from the conclusions of the majority of the court, that I deem it proper to state at length the grounds of my dissent.
The case is presented on a bill of review to reverse the decree of the late supreme court of Hamilton county. The result of the whole controversy in the case is involved in the determination of the question as to which of two mortgages shall hold certain real estate in the city of Cincinnati, known in this case as the “"Western Row property.”
James C. Ludlow having become liable as surety for Charles S. Clarkson on certain notes, one of which was for the sum of fifty-nine thousand dollars, discounted and held by the Lafayette Bank of Cincinnati, Clarkson, on the 11th day of January, 1840, gave Ludlow a mortgage, which was duly executed and recorded, on the property in *40 question, to secure Ludlow against his said liability. Clarkson became insolvent, and the bank having recovered a judgment against Clarkson and Ludlow on the note for $59,000, issued execution and levied on the property of Ludlow. After the decease of Ludlow, the property of Clarkson having been exhausted, the bank demanded of Ludlow’s estate the payment of $25,000, as the balance of the judgment. To protect the estate from loss and insolvency, and reach the property mortgaged by Clarkson to Ludlow for his security, the administrator of Ludlow filed the original bill, July 1,1842, making Grant & Stone parties defendants, who claimed to hold a prior mortgage on the same premises, and praying to have their mortgage set aside as void and of no effect. This prior mortgage, which is set up by Grant & Stone, (the complainants in review,) was given by Clarkson to Josiah Lawrence, on the 30th of November, 1839, and recorded on the 6th of December following, and was assigned by Lawrence to Grant & Stone, on the 17th of October, 1840. It was given for Lawrence’s indemnity, and subject to the following condition, to wit: “That if Clarkson shall indemnify and save harmless Lawrence against all liability to Grant & Stone, in consequence of failing to take sufficient security, or of releasing or giving up any security when taken, in behalf of said Grant & Stone, to indemnify them against any loss or detriment from their acceptances of Clarkson’s drafts, to the amount of about $50,000, more or less, predicated upon shipments of bacon and other produce, in the year 1839, and from and against all suits, demands and claims; and from and against all expenses and costs in defending any suits, demands or claims of said Grant & Stone, against Lawrence, by reason of the causes aforesaid, then to be void.”
The bill in the original case recites the mortgage given to Lawrence, the assignment of it to Grant & Stone; denies Lawrence’s liability to Grant & Stone upon any of the contingencies provided for in the mortgage; and avers *41 that neither Grant & Stone nor Lawrence have any valid claim on the property. Grant & Stone, in their answer, assert Lawrence’s liability to them, and also claim that. Lawrence’s mortgage inured to their benefit, as the first lien on the property, whether Lawrence was liable to them individually or not.
The late supreme court of Hamilton county decreed against the claim set up by Grant & Stone, and ordered the sale of the premises, and the application of the proceeds to the payment of the judgment obtained by the bank against Ludlow and Clarkson. And it is the reversal of this decree which is sought by this bill of review.
The first question presented is, whether there is any sufficient ground for interference with the decree, on bill of review. If there be any thing well settled in chancery practice, it is that there are but two grounds upon which a bill of review is pei’mitted to be brought. These are, first, errors apparent on the record; and second, matter newly discovered or occurring after the decree. If a bill of review could be sustained for a mistaken judgment of the court upon the evidence, it would be a mere substitute for a petition for rehearing, or an appeal. It is, therefore, settled that mere difference of opinion as to the weight of the evidence would not justify the reversal of a decree on bill of review. Tracy v. Sackett, 1 Ohio St. Rep. 58. And any relaxation of this rule would lead to a looseness of practice wholly unwarranted by the course of adjudication, either in England or in this country. In Barnum v. McDaniels, 6 Verm.Rep. 177, the court say: “It cannot be assigned for error that the matters decreed are contrary to proofs, that the court gave too much or too little weight to testimony, or that a fact was misunderstood by the court.”
In Whiting et al. v. The Bank of the U. S., 18 Pet. Rep. 6, the supreme court of the Hnited States said: “The bill of review must be founded on some error apparent upon the *42 bill, answer and other pleadings, and decree; and a party is not at liberty to go into the evidence at large, in order to establish an objection in the decree founded on the supposed mistake of the court in its own deductions from the evidence.”
The bill before us is not founded on newly discovered matter, or matter occurring after the decree. This is not pretended. The only ground claimed for this bill is error apparent on the face of the decree. And the only assignment of error upon which reliance is placed by the complainants in review, is, that the court decided that Grant & Stone were not entitled to set up their claim under the mortgage to Lawrence as a prior lien to the claim arising under the mortgage to Ludlow. Now, before the mortgage to Lawrence could have been set up and enforced in preference to Ludlow’s mortgage, the fact of Lawrence’s liability to Grant & Stone for negligence or misfeasance in regard to their business must have been fully established. This was not done by a judgment at law. And waiving for the pi'esent the question of the necessity of a resort to an action at law to establish the liability of Lawrence, it is conceded that Lawrence’s liability must be proven and found, in order to lay the foundation for the claim under the mortgage, upon which the complainants in review place their whole case. If Lawrence was not liable for neglect of duty, the condition of defeasance was not broken, and the mortgage could not be enforced against the mortgaged premises. And the existence or nonexistence of Lawrence’s liability depended on the weight to be given to the evidence touching the question of negligence or misfeasance on his part. This was a main question, and an essential point on the facts of the case. The decree shows that the supreme court of Hamilton county determined that question against Grant & Stone. And that decree cannot be reversed on bill of review on the ground of error in the judgment or conclusion of the court as to the wéight of the evidence. It would be no *43 answer to this, to say that the court may possibly not have passed on the question of negligence or misfeasance on the part of Lawrence, hut decided the case on the ground either that he had not been actually damnified, or that the assignment of the mortgage to Grant & Stone was invalid and ineffectual to pass the interest held by Lawrence. The record shows no such thing, and an error in matter of law for which a bill of review will lie, must be apparent on the face of the record. The question of the liability of Lawrence for negligence was before the court as a leading and turning point on the facts of the case. The decision of that point one way, was absolutely conclusive against the claim of Grant & Stone. And to assert that it is apparent upon the record that the case was not decided upon this, but upon another and different ground, is to contradict the record itself. It cannot be said that there was error in the decree, without an inquiry into the judgment and conclusion of the court on the evidence. The case does not, therefore, furnish proper and sufficient ground, as I humbly conceive, for interference on bill of review for error apparent on the face of the record and decree.
But if we are authorized to go behind the record, and inquire into the conclusion and judgment of the court of Hamilton county on the evidence, I am still unable to concur with the majority of the court in the opinion just announced.
In the view taken of this case, it is not pretended that the complainant in review is entitled to any relief predicated on any claim under the equitable mortgage to Grant & Stone on the Clifton farm. In that regard, the original decree is affirmed. And the ground upon which the reversal of the decree is placed, is founded solely on the claim set up by Grant & Stone under the mortgage to Lawrence, which was assigned to them. That mortgage was not given to secure the payment of money to Grant & *44 Stone, or to indemnify Lawrence as to any engagement by him to pay the debt of Clarkson to Grant & Stone; on the contrary, it was in express terms designed as simple indemnity to Lawrence against loss or detriment, in case any should arise from any claim which might be asserted by Grant & Stone for any supposed negligence on his part, either in failing to take sufficient security, or in releasing or giving up security taken for their benefit in their transaction with Clarkson. This mortgage was personal to Lawrence, and for his exclusive benefit. The lien which it created depended wholly on the contingency of his liability for negligence, and his being subjected, on that account, to loss or detriment. If the contingency never occurred the mortgage was of course wholly inoperative. Subject to this expressly stipulated contingency alone, could the mortgage to Lawrence have any legal operation against the claim of James C. Ludlow, the subsequent incumbrancer. And after the mortgage to Ludlow took effect, it was not competent for Clarkson, Grant and Lawrence to change the nature or legal effect of Lawrence’s mortgage to the prejudice of the rights of Ludlow. And it cannot be claimed that Grant & Stone are entitled to any relief under their assignment of Lawrence’s mortgage, which Lawrence himself could not have set up under the mortgage unassigned. And the mere contingent claim ■ (not negotiable), to which the mortgage was but an incident, if it could have been transferred at all, was of such a nature that it- could only be worked out or enforced by the assignees, through Lawrence himself.
The first inquiry, then, presented to test the question whether the contingency occurred, which rendered the mortgage to Lawrence operative as a lien, taking precedence over the mortgage to Ludlow, is, whether Lawrence was guilty of such negligence, either in taking or in surrendering security for Grant & Stone, as rendered him personally liable to them' in damages. A solution of this *45 inquiry involves a consideration of the relative situation of the parties, the peculiar circumstances attending the transaction, and the obligations under which Lawrence acted at the time.
It appears that, in September, 1838, Clarkson, who had been for years a produce merchant in active business at Cincinnati, went eastward, with commendatory letters from Lawrence and other well known business men, to make arrangements for extensive operations in the pork business the ensuing season. Through a letter of introduction from Lawrence, he made the acquaintance of Grant & Stone, in Philadelphia; and after some considerable negotiation, entered into the arrangement with them expressed in the letters of Grant & Stone to Clarkson, of the 13th, 14th, and 19th of September, hereinafter recited. By this arrangement, Clarkson was to make Grant & Stone his agents for the sale of bacon the coming season; Grant & Stone were to accept Clarkson’s drafts, to the amount of some $30,000, and raise the money on their acceptances in Philadelphia; and for the proceeds of these acceptances Clarkson was to draw at sight. And further accommodations- were to be arranged for afterward. Clarkson was to ship to Grant & Stone bacon sufficient to cover their acceptances, and not less in any event than 500,000 lbs., to be sold the coming spring; and was to allow them, besides expenses and interest, four per cent, commission, and one per cent, additional on the largest amount they should be at any time in advance for him; also one per cent, more for drafts on them at sight, for proceeds of acceptances, and one per cent, more for commissions on provisions sent to other places. And for the performance of the engagement on the part of Clarkson, he was to give security, which Grant & Stone speak of as “ collateral and temporary,” to the satisfaction of Lawrence, as the mutual friend of the parties, in Cincinnati. The same arrangement was extended until the acceptances and advances of Grant & Stone for Clarkson reached the *46 sum of about $51,000. Lawrence, acting simply as the mutual friend of the parties, without compensation or any personal interest in the transaction, took from Clarkson, for Grant & Stone’s security, an equitable mortgage on unincumbered real estate, estimated at that time to be worth $60,000, consisting of what was known as the Clifton farm, three miles north of Cincinnati, containing about 530 acres of land; and also the further stipulation by Clarkson to give additional security, should it at any time be asked; and in the event of his death during the season, that Lawrence should take immediate possession of so much of the bulk pork or bacon on hand, as might be sufficient to secure Grant & Stone for their acceptances and advances.
Under this arrangement, Clarkson shipped over 600,000 lbs. of bacon, which Grant & Stone received in good order, at Philadelphia, early in the spring of 1839, and which, at .the prices for which bacon was then selling in the market in Philadelphia, was worth over $65,000. Grant & Stone, anticipating a rise in the market price of bacon, with the consent, and at the suggestion of Clarkson, held on and made but few sales in the spring of 1839; hut the price, instead of rising, fell greatly. They shipped a part of the bacon to other markets, and shipped it, in part, back again, and a part of the article spoiled on their hands; so that the operation proved disastrous in its results, and Clarkson, by means of it, was reduced to insolvency.
It is not pretended that Clarkson misapplied any part of the money received by him from Grant & Stone. It appears that he expended it in the pork transaction, and sent forward the bacon pursuant to his engagement. And all the money which was realized from this unfortunate adventure, went into the hands of Grant & Stone, who, after receiving some eight thousand dollars as the proceeds of the sale of the Graham country seat property, are claiming still a balance coming to them of between twenty and thirty thousand dollars, besides interest; the greater part *47 of which is, doubtless, made up by the amount of their charges for commissions, interest, premiums on renewals, storage, insurance, re-shipment, etc.
The uncertainty and hazards of commercial enterprises, often disappoint the highest hopes and expectations of both consignor and consignee; but the large profits anticipated from a fortunate result, are considered a sufficient inducement for the risk. In this instance, however, it is insisted that the losses of Grant & Stone in this adventure, in which they embarked in view of large profits, shall be borne by one, who had not only no personal interest in the transaction, but tohose only connection with it consisted of acts of gratuity, intended as acts of friendship. This can be done only by the operation of some stringent and unbending rule of law.
Eraud or bad faith on the part of Lawrence, in his connection with this transaction, is not averred in the pleadings, nor has it been claimed on the trial; on the contrary, it has been distinctly and repeatedly disavowed. Grant & Stone, in their letter to Lawrence of the 2d of January, 1840, said that they “ never had any doubt of his good intentions.” Some of the remarks in the opinion of the majority of the court, are calculated to leave the inference of bad faith on the part of Lawrence. But, as I humbly conceive, he is not liable to the imputation, and much less chargeable on the ground of fraud, when it is not only not averred in the pleadings, but openly disavowed on the hearing of the case..
Lawrence is only charged with negligence; and as he was an agent without compensation, it is conceded, that nothing short of gross neglect will suffice to impose upon him a liability. And as the case stands, to charge Lawrence with the consequences of this commercial adventure, in which he had no expectation of profit to himself, the case against him must be a clear and strong case of gross negligence.
“What constitutes gross negligence, is a matter which *48 'does not admit of any very precise general definition. The liability of a compensated agent is governed by one rule, that of an uncompensated agent by another. The former is held to the exercise of ordinary care and diligence, while the latter is responsible only for an omission of slight care, or in other words, for gross negligence. In the case of Tracy v. Wood, 8 Mason Rep. 135, Judge Story defined gross negligence as follows : “ The question is not whether he has omitted that care which very prudent persons usually take of their own property, for the omission of that would be but slight negligence; nor whether he has omitted that care which prudent persons ordinarily take of their own property, for that would be but ordinary negli-, gence; but whether there be a want of that care, which men of common sense, however inattentive, usually take, or ought to be presumed to take, of their own property, for that is gross negligence. The contract of bailees without reward is not merely for good faith, but for such care as persons of common prudence in their situation usually bestow upon such property.” In the case of Sodowsky v. McFarland, 3 Dana Rep. 207, the rule laid down by Story is fully recognized; and that case is especially worthy of attention, inasmuch as, in that case as in this, the plaintiffs attempted to build a liability upon an alleged admission of the mandatory. It appeared that there had been a direct admission of negligence, and a declaration of intention to pay the loss. The court was, however, of opinion that the defendant’s testator was not guilty of gross neglect, and that, under the circumstances, an admission of negligence and intention to pay was not binding; adding, “the testator may have believed that he had been negligent, and have, therefore, felt conscious of some honorary obligation, but, nevertheless, he may not have been grossly, or even ordinarily negligent, and may not have incurred any legal liability.”
The same rule of liability is established in Beardslee v. Richardson, 11 Wend. Rep. 25; and in the case oi.Tomp *49 kins v. Sollmarsh, 12 S. & M. Rep. 279, it was held, that a gratuitous bailee is liable only for gross negligence, dolo próximas. In Foster v. Essex Bank, 17 Mass. Rep. 500, a case of deposit, the doctrine was fully recognized, that there must be proof of gross neglect to charge a depositary without reward, and, in the language of the court, that gross neglect “ which, as is everywhere observed, bears so near a resemblance to fraud as to be equivalent to it, in its legal effect upon contracts.” In Moore v. Mourgue, Cowp. Rep. 480, one requested to obtain insurance for another, procured a policy which excepted a particular risk, from which a loss arose. It appeared that this risk was not excepted in the policies of the other offices, though their charges for premiums were the same. And it was held, that the agent was not liable for the consequence of insuring in the most disadvantageous office, for he had acted “ bona fide, and to the best of his judgment, and without gross negligence.” The case of Shields v. Markburne, 1 Hen. Bl. Rep. 158, is to the same effect. A merchant, requested to enter certain goods of the plaintiff at the custom-house, entered them with his own of a like kind, but, by mistake, in a wrong name, in consequence of which all were lost. The court said, “ that when the undertaking is gratuitous, and the party has acted bona fide, it is not consistent with the.spirit or the policy of the law to make him liable to an action;” and the whole court held, that a mandatory was not liable, except for gross negligence; and that an express or implied warranty of skill was necessary, under the circumstances, to impute to him gross negligence.” Story, in his work on Bailments, 131, commenting on that case, said, that this doctrine has never been impeached, and has been incidentally affirmed in analogous cases, both in England and in this country.
I take it to be well settled, that where a mandatory or gratuitous bailee has acted in good faith, and exercised some degree of care, although less than that reasonable and ordinary degree of care required of a bailee for hire, he is *50 not liable for a loss arising from any oversight, mistake, or error of judgment on his part. And in no event could such gratuitous bailee be made liable for negligence, where he had exercised that care which he would have taken, under the circumstances, had the business been his own.
Taking the rule of liability for negligence thus defined, I inquire, what was the nature and extent of Lawrence’s undertaking for Grant & Stone, and with what act of negligence was he chargeable ?
It is claimed, on the one hand, that Lawrence’s undertaking was to take security for the repayment of the money obtained on Grant & Stone’s acceptances, and also for the ultimate result of the enterprise, so far as their interests were affected. > On the other hand, it is insisted, that the security which he was required to take, was simply security for the fulfillment of the engagement, on the part of Clarkson, to make Grant & Stone his sole agents in the east, that season, and to procure and send forward to them the stipulated quantity of bacon, in proper order, and in due time. "Was the security required by Grant & Stone merely temporary and collateral to Clarkson’s express engagement, or was it designed to be permanent security against any loss from the ultimate results of the adventure ? This is to be determined by the nature of the arrangement, the terms of Lawrence’s instructions, and the circumstances under which the parties acted.
It is worthy of especial notice, that Grant & Stone gave no direct and express instructions to Lawrence as to the form and nature of the security they desired him to take. The three letters of Grant & Stone to Clarkson, of the 13th, 14th, and 19th of September, 1838, (general and loose as they are in their terms,) contain the only directions given to govern Lawrence in taking the security. These letters, taken from the complainant’s own abstract of the pleadings and evidence, are as follows:
Grant & Stone to Clarkson, Philadelphia, September 13th, 1838, after referring to morning’s conversation say:
*51 “ We can dispose of a great deal of bacon; and if you make us your sole agents, and allow tes to use our neighboring markets, you cannot send us too much. We usually advance two-thirds to three-fourths the value of an article on its arrival here, and, except in particular cases, where we have agreed to advance on bills of lading, with orders to insure, seldom deviate; and when we do advance, claim the right to guarantee sales at our usual charge. Should decline your proposition, it being out of our usual course, but for our mutual friend Lawrence’s strong introduction, and your proposition to secure us on real estate ; for though, as commercial men, we do not like real estate, particularly at a distance, yet in your case, as it is only intended as collateral and temporary security, we shall accede to it, and endeavor to meet your wishes, and, therefore, propose to advance you $25,000, by accepting your four and six months drafts, based on consignments of at least 500,000 lbs. of bacon, to be sold on your account next spring ; and should you not consign so much, our commission to be charged as if the whole had been consigned; provided you draw for the whole $25,000; or otherwise, in that proportion. When the acceptances fall due, if you wish your property held, or we are not in funds from sales, you are to draw again, and you to meet the drafts falling due. By this plan we advance you five cents a pound on your bacon, and when we pay the carriage and charges here, we think it will be all you can wish. Our charges will be, the expenses and four per cent, commission, and guaranty on all sales.”
Grant & Stone to Clarkson, September 14tb, 1838, after referring to last evening’s conversation, say:
“Our understanding is, you are to make us your agents for the sale of provisions the coming year. Minimum of sales to be 500,000 lbs. bacon. We to advance you in cash $10,000 to $12,000, in our acceptances of your drafts at four to six months,. $20,000 to $25,000. The acceptances to be renewed, if necessary; but no more to be in cash advances beyond the amount stated, and the expenses of transportation. You to furnish us with certain security, or the guaranty of Lawrence for our advances, commissions, and interest; so that in case of accident to you, or incapacity in any way to fulfill your engagement, it shall be carried through by him, ■without any loss to us. The provisions beyond the 500,000 lbs. to be sold here or otherwise disposed of for your interest. We to guarantee our sales, and charge you on sales four per cent, commission, and one per cent, on the largest amount we may he in advance to you in cash or acceptances at any one time. This last charge because of the peculiarity of this transaction. For commissions on provisions sent to other places, would not one per cent he right?”
Grant & Stone to Clarkson, September 19, 1838.
“ On the basis of ours of the 14th, and our further conversation with you, we add our present understanding. We agree, on your making the point of security entirely satisfactory to Lawrence, that we are to accept and retain your drafts on us at six months for $30,000; for which, less discount, you are to draw on us at sight, and on this we are to charge you one per cent, in addition to the charge proposed in ours of the 14th instant. We are not to be in cash advances for you for any portion of this $30,000, unless perfectly agreeable to us. As you will want no further accommodation now, the particular arrangement for a few thousand dollars more *52 at six months, can be made hereafter. Interest on the present advance of $30,000 to commence on the 20th instant. Shall expect to hear from you and Lawrence immediately on your arrival at Cincinnati, and doubt not all will be right.”
Clarkson, on his return from Philadelphia to Cincinnati, presented these letters to Lawrence, in connection with his own verbal explanation of the arrangement he had made. And Grant & Stone, instead of writing Lawrence and explaining the terms of the arrangement themselves, and giving Lawrence specific instructions, entrusted the matter to Clarkson, and allowed him to communicate the terms to Lawrence. The import of these letters, taken in connection with Clarkson’s verbal explanations, must be considered in reference to their subject matter, and the nature of the arrangement entered into, for the purpose of ascertaining the real intention and understanding of the parties.
Eor what was the security asked? Manifestly and expressly for the fulfillment of the engagement on the part of Clarkson. Nothing else was, at the time, in the contemplation of the parties. And what was that engagement? To make Grant $ Stone his “ sole agents for the sale of his provisions the coming year;” “allow them to use their neighboring marketsand “to forward them at least 500,000 lbs. of bacon to be sold the next spring.” Such was the undertaking on the part of Clarkson, as expressly declared in the letters. Nothing was said about the payment of money to Grant & Stone, or the refunding to them any balance on the advances to be procured on their acceptances. The advances were to be based on the consignment of the produce, and Grant & Stone reimbursed from their own sales. Nothing was said about securing Grant & Stone in their commissions and other charges, and possible losses, in the event of an unfortunate result. The advances were to be less than the estimated value of the minimum amount of bacon to be sent forward. Such a thing as loss to Grant & Stone, in case Clarkson fulfilled *53 his engagement to send forward the bacon, was not dreamed of at the time, and conld not have entered into the contemplation of the parties. Possible disasters are more or less incident to all commercial enterprises. If Grant & Stone had been stipulating for security for their profits, commissions, and charges, and indemnity against all losses from anticipated ultimate possible disaster upon Clarkson, after sending forward the bacon in good order, it is fair to infer that very different instructions would have been given to Lawrence, and different terms fixed upon in the arrangement.
The language of the letter of the 13th of September, shows that the arrangement contained but one deviation from the customary mode of such transactions; and that, a deviation in the form and manner of conducting the business, and not in the nature and legal effect of the transaction. “ We usually advance,” said Grant & Stone, “ two-thirds to three-fourths the value of an article on its arrival h&re, and except in particular cases, where we advance on bills of lading, seldom deviate,” etc. It is an elementary principle, that mercantile contracts must be construed according to the sense attached by mercantile usage to the terms employed by the parties. And it is well settled, that where goods are consigned to a factor, who makes advances on them on delivery, he acquires a qualified property in the goods, and an absolute right to sell, at any time, for the best price that can be obtained, without regard to the interest of the principal. Smith’s Mercantile Law 151. Where, therefore, a factor makes partial advances on the arrival of goods consigned to him for sale, he needs no better security for his advances than the goods themselves. He does not advance on the idea of collateral security, but on the property only. He keeps himself covered by the consignment. His rights are fixed when the advance is made; and his right to sell at discretion, to reimburse himself, is beyond the control of the consignor. So that, when Grant & Stone, according to the custom of *54 trade spoken of, advanced two-thirds to three-fourths the value of an article consigned, to them, on its arrival, they required no further security for their advances. In this instance, however, they deviated, in one particular, from the custom. They agreed to make the advances before the delivery of the article, which Clarkson bound himself to procure and ship to them. Hence security was required, “ temporary and collateral,” until the article to be consigned to them was in hand. The security was simply a temporary substitute for the article itself. Had the advances been made on the arrival of the article, no security would have been required. But as the advances were made before that, the collateral security was required for the fulfillment of the engagement to forward the article. The only deviation, therefore, from the customary mode of the transaction, consisted in the advances beforehand, and security for. the consignment and delivery of the bacon.
Judge Story, in his work on Agency, sec. 74, says that “ letters of instruction are generally drawn in a loose and inartificial manner, and are designed to subserve the common purposes of life and business, and leave much to be gathered from the usages of trade and the practice of different employments.” “And it is equally true,” he says, “that the agent impliedly agrees to act only in pursuance of the modes of business and usages of trade.” And the same author adds, in his same work, sec. 96: “ The known usages of trade and business often become the true exponents of the nature and extent of an implied authority.”
Now, construing the language of the contract with reference to the usage of trade alluded to in the letter1, no doubt can exist that the security was designed to be simply temporary, and to continue only until the arrival of the bacon. The further language of the letter of the 13th makes this so explicit as to remove all ground for doubt. “For though, as commercial men, we do not like real estate, particularly at a distance, yet in your case, as it is only intended as collateral and temporary security, toe shall ac *55 cede to it, etc., and propose to advance you $25,000, by accepting your four and six months drafts, based on consignments of at least 500,000 lbs. of bacon, to be sold on your account next string.” Why was the security denominated “ collateral and temporary ?” And to what was it collateral ? If intended to secure Grant & Stone in their profits, expenses and advances, in the ultimate outcome and closing up of the enterprise, it would have been permanent, not temporary security, and would not have been collateral to Clark-son’s engagement to forward the bacon. Eor the very reason, however, that the security was simply collateral to Clarkson’s engagement, the drafts were to be based on the consignment of the bacon, the minimum amount of bacon to be sent forward specified, and the time when the bacon was to be sold, mentioned.
The language used in the letter of the 14th September, is equally explicit, and to the same effect. “ You to furnish us with certain security, or the guaranty of Lawrence for our advances, commissions and interest; so that, in case of accident TO YOU, OR INCAPACITY IN ANY WAY TO FULFILL YOUR engagement, it shall be carried through by him without any loss to us.” “Certain security or guaranty of Lawrence,” with what view, and upon what condition? It is distinctly expressed. With a view to the fulfillment of the engagement on the part of Clarkson, and on the condition — “so that” — if Clarkson should, “by accident, or incapacity in any way,” fail in his engagement, what then? That they should be reimbursed? No, but that the engagement to forward the bacon should be carried through by Lawrence, “ without loss to us.” The security required was clearly intended as simple security for Clarkson’s engagement — for the sending forward the bacon. Beyond the fulfillment of the engagement they did not look — beyond the consignment and arrival of the bacon in Philadelphia, they did not seek security. It is manifest that they would, according to the usage, have made the same advances on the arrival of the bacon, without security. *56 But as the advances, or rather acceptances, were made in advance of the consignment, the temporary security was required collateral to the engagement to send forward the bacon. The advances, or rather the acceptances, were, in express terms, based on the anticipated consignments. It is clear, therefore, that the security required was for the transmission of the bacon, and not for any deficiency in the sales. It is certainly not reasonable to suppose that Grant & Stone would have had the temerity to have asked, and much less that Clarkson, or any competent man engaged in that precarious business, would have consented to have given security for the successful winding up of the consignment and ultimate realization of the large profits of the commission merchant, in anticipation of disastrous losses after the entire produce on which the advances had been made, had been sent forward, and in good order placed in the hands of the consignees.
Looking to the language of these letters, and construing it with reference to ¡the nature of the transaction and ordinary usages of the business, it is clear to my mind that the security required at the time could not have been intended for any other purpose than guarding Grant & Stone against any default of Clarkson, from death, inability, or other cause, in the fulfillment of his engagement to send forward the bacon.
Without any direct and specific instructions as to the form and character of the security to bo taken, Grant & Stone left the matter to the discretion of Lawrence, and in their above letter of the 19th September, they said: “ We agree, on your making the point of security entirely satisfactory to Lawrence,” etc. This they say without directing or prescribing what Lawrence should require. And inasmuch as Grant & Stone did not give Lawrence any direct written instructions, but entrusted Clarkson with the matter of explaining the arrangement to Lawrence, they must be bound by the statements made by Clarkson to Lawrence in connection with these letters. And Clarkson, in *57 Ms deposition which is taken by tbe complainant, testifies as follows: “ Tbe security, as I understood it, toas for the delivery of that amount of bacon; can’t say Grant & Stone so understood it, but believe they did. On my return to Cincinnati, I explained to Lawrence verbally, and by showing him Grant $ Stone’s letters, received in Philadelphia.”
That both Lawrence and Clarkson acted upon the supposition, that the security was simply for the fulfillment of the latter’s engagement to send forward the bacon, is perfectly apparent from the conduct of the parties themselves. It is not pretended that there was any bad faith on the part of either Clarkson or Lawrence, especially at this 'period of the transaction. The terms and condition of the equitable mortgage which Lawrence took from Clarkson, on his Clifton farm, for Grant & Stone, fully show the understanding of the contract at that time. They are as follows: “The above sum was advanced to me for the purpose of purchasing pork; and to secure Grant & Stone I hereby mortgage the above farm to them, to hold as security until the conditions of our agreement be fulfilled, as rollo ws : I to make them my exclusive agents for the sale of bacon I may ship to the east the coming season; not to .send less than 500,000 lbs., but probably over 1,000,000 lbs. "When the ABOVE CONDITIONS ABE COMPLIED WITH, THIS OBLIGATION TO BE VOID,” etc.
Now, Lawrence’s letters to Grant & Stone, in which he speaks of the security for their advances, or security to cover their liabilities, must be taken with the manifest understanding which Lawrence had at the time in regard to the nature of the security required — that it was temporary — collateral to Clarkson’s undertaking to send forward the bacon, and its purpose accomplished and at an end on the arrival of the article to be consigned to them. In his letter of the 28th of September, 1838, he said: “Have just seen Clarkson, and he will to-day, give me ample security on your account to cover any liabilities you have engaged to come under for him. He will probably value on you to-day *58 for $10,000, and if so, it will be all right.” Lawrence, never suspecting that Grant & Stone could ever understand the transaction differently from that understanding upon which he was manifestly acting, does not make his communication as full and explicit as he might have done. By “the ample security to cover any liabilities,” etc., he of course meant the temporary and collateral security required until the bacon was in hand. He could not have meant any thing else. The only understanding given to him, up to that time, was, that the security was to be temporary, and to cover the advances until they were covered by the consignment. The letter must be construed, therefore, in its connection with the rest of the transaction. Any other construction would impute fraud — deceit the most bare faced to Lawrence, in a manner wholly inconsistent with his acknowledged high standing as a business man, and without any adequate rational or conceivable motive.
Lawrence’s letter to Grant & Stone, of the 15th of October, 1838, must receive the same construction. It is as follows:
“ Clarkson says he will have occasion to draw on you in November for about $30,000, at live or six months time. He has given me what 1 consider ample security on your account for that sum, and also authorized me, in case of accident or death, to ialce possession of dll the pork, bacon, or lard that may have been put up, to protect all the bills he may have made on account of his pork operations, or other liabilities you may have come under on his account.”
The security was “ considered ample for that sum,” as temporally and collateral security of course, for that was the only security understood to be required. It was ample security until the advances should be fully covered and made safe by the consignments in view of which only the security was asked and agreed to be given. And the circumstance that Lawrence stipulated for authority, in case of accident or death, to take possession of the pork, bacon or lard put up, as additional security to Grant & Stone, shows that the proceeds of Clarkson’s operations in pork were relied on as the primary object in view. *59 Otherwise, as there was ample security without it, there would have been no object in this stipulation.
And it is manifest from the letter of Grant & Stone, of the 23d October, which is in reply to the letter of Lawrence, above mentioned, of the 15th, that their understanding of the character of the security, was not different from that of Lawrence, at that time. That letter is as follows :
Grant & Stone to Lawrence, October 23d, 1838:
“ Yours of the 15th received. We have a very favorable impi’ession as to Mr. Clarkson, as you may suppose, when you know we raised him near $30,000 cash, and now give him permission to draw for $20,000 more, making about $50,000, which we consider under your guardianship. Such amounts should, of course, be well guarded when running on a single risk of life; and although we hope to shake hands with Mr. Clarkson some ten or twenty years hence, yet we think the arrangement you have made very proper, and are glad you did so.”
“The arrangement” alluded to in this letter, is doubtless the stipulation for authority to take possession of the pork, lard, etc., in case of accident or death. And what was meant by the expression, “ Such amounts should, of course, he well guarded when running on a single risk of life ?” The consignments and going forward of the bacon, according to Clarkson’s agreement, were supposed to depend on the risk of his life. The amounts advanced, therefore, “ were running on the single risk of life,” and should, for that reason, be well guarded. The risk of sales, or loss of the bacon after delivery, was not in contemplation. The security was to guard against that risk of life which might defeat the fulfillment of Clarkson’s engagement to forward the bacon. In this sense, the security required was only temporary, and collateral to Clarkson’s engagement.
It was not until August of 1839, after the disasters in the pork business of that season became manifest, and after it became apparent that Clarkson must lose largely, and that, contrary to all expectation, his consignments of bacon to Grant & Stone might fail to cover all his liabilities for advances, expenses and commissions, that the first intimation is made by Grant & Stone to Lawrence, that *60 they relied on his holding permanent security for ultimate results, instead of the temporary and collateral security mentioned in their first letters. This intimation appears for the first time in their letter of August 2d, 1839, in the following words: “ Sales cannot now be forced at any reasonable price; and this bacon has been all carefully stored at great expense, and, we flatter ourselves, is in good condition ; but on this you know we cannot rely, and may find it spoiled, or so far injured as to reduce its value, and our reliance is on your holding ample security to pay us, if the bacon does not produce any thing.” In several subsequent letters they insist upon the same thing — that is, that they understood that the security to be taken by Lawrence was to be, no't simply temporary and collateral to Clarkson’s engagement, but permanent security, for the ultimate results of the enterprise. This interested claim of Grant & Stone, however, after the disastrous result of the enterprise became manifest, is not competent evidence, on which a decree could be predicated in their favor. The true inquiry is, not what Grant & Stone claimed, after they became apprehensive of loss from the ultimate result of the transaction, or, indeed, how they themselves originally undei’stood the requirement of security. The real ixxquiry is, whether the terms of the original engagement required permanent, or only temporary and collateral secuxity, axxd how Lawrence understood, it. If Grant & Stone were so loose and negligent in their instructions, or in prescribing terms for the security, as to mislead Lawrence by their own ambiguous language, upon no pxúneiple of law or semblaxxce of justice can they throw the loss xxpon him.
It is a well settled rule, that in cases of ambiguity in the instructions given to an agent, the language used is to be constx’ued most stx’ongly agaixxst the principal. In Courcier v. Ritter, 4 Wash. Rep. 551, Mr. Justice Washington, speaking ixx reference to the questions betweexi principal and agent frequently oceurxing in courts of justice, as to the construction of instructioxxs alleged to have been violated, *61 said: “If they” (the orders or instructions) “ are so ambiguous that two constructions may fairly be given to them, every principle of justice demands that the want of precision in the writer should fix the loss, if any, upon him rather than upon his correspondent.”
So also, in Story on Agency, sec. 74, it is said: “ There is another consideration, highly important, to be borne in mind in the interpretation of written instruments, and especially of those of a commercial nature, such as letters of instruction or orders, and that is, that if the instrument is not expressed in plain and unequivocal terms, free from ambiguity, but the language is fairly susceptible of different interpretations, and the agent in fact is misled, and adopts and follows one when the principal intended the other, there the principal will be bound, and the agent will be exonerated. For, in such a case, the agent has acted in good faith, and within the supposed limits of his authority; and if one or two innocent parties, must suffer, he ought to suffer in preference who has misled the confidence of the other into any unwary act. In cases of doubt, the general rule is, that the words are to be construed most strongly against the writer; ‘ verba fortius accipiunter contra Proferentem.’ ”
In the language of Mr. Justice Washington, “ a claim for damages against an agent comes with a bad grace from a principal, who complains of a disobedience of orders, couched in ambiguous terms.”
It is conceded throughout this case, that Lawrence acted in good faith. In his letter to Grant & Stone, of the 16 th of December, 1839, he said, what he repeated in his deposition, “ I acted in the premises the same as I would have done had the case been my own.” To this Grant & Stone replied, in their letter of the 2d of January, 1840, what they never retracted or qualified at any other stage of the transaction: “ We never had any doubt of your good intentions, but naturally felt anxious, as it has eventuated so differently from our anticipations.” While they knew the high standing of Lawrence as a business man, they also knew of his extensive business *62 engagements, both as a merchant and as the president of the Lafayette Bank of Cincinnati. Called upon to do a mere act of accommodation, as a gratuitous agent, it could not have been expected of Lawrence that he would burden himself with the labor of a lawyer or compensated attorney, either in the critical examination of instruments of writing, the drafting of conveyances, or the searching of the public records, in the investigation of land-titles. Such research and labor was not, at the time, supposed to be requisite. Clarkson was at that time all Lawrence represented him to be — “An old and respectable citizen of Cincinnati. Had been for many years engaged in the pork business. His preparations ample, and his knowledge of the business surpassed by none in the west; was a large owner of real estate, and some of the most valuable in that part of the country, and entirely unincumbered.” That all this was strictly true, is not controverted. It appears that he had, to the fullest extent, the confidence of the business men in Cincinnati, both as to his ability and his disposition in the performance of his engagements, and was, at the time, acting as one of the directors in the bank of which Lawrence was the president.
Under .these circumstances, Lawrence transacted the business with Clarkson, with that abiding confidence with which he would have done it had the business been his own, instead of that of Grant & Stone. And it is at least a matter of doubt whether Grant & Stone, had they been at Cincinnati themselves at the time, would have taken any greater precaution, or used greater vigilance, than Lawrence did. The approaching disasters in the pork business of 1839, the revulsions in trade, and the consequent great fall in the price of property, was wholly unforeseen, and not thought of, in the fall of 1838. The written terms of the arrangement, contained in the letters of the 13th, 14th, and 19th of September, were presented to Lawrence, with Clarkson’s verbal explanations. The security asked was “temporary, and collateral” to Clark- *63 son’s undertaking to send forward the bacon. Tbe advances were to be based on anticipated consignments. In the absence of different and more specific instructions,' Lawrence bad good reason to infer, as be did, that tbe security required was security for tbe transmission of tbe bacon, and not security against deficiencies in tbe sales of tbe bacon after delivery. It was manifestly tbe supposition of all tbe parties, at tbe outset, that tbe advances would be fully covered by tbe consignments as soon as tbe bacon went forward. And it is my opinion, on full consideration, that the written terms of the arrangement prescribed by Grant & Stone, fairly admitted of tbe construction given to them by Lawrence and Clarkson. But if it were otherwise, it does not affect tbe question of Lawrence’s liability. I care not bow Grant & Stone may .have understood tbe matter themselves. Tbe terms they prescribed themselves, are to be construed most strongly against them; and they cannot throw upon their gratuitous agent, acting in good faith, tbe disastrous consequences of their own commercial adventure, if be was misled by loose and ambiguous directions.
I inquire, then, with what act of gross negligence is Lawrence chargeable? Not, certainly, in taking simply temporary security, collateral to tbe engagement for tbe transmission of tbe article, on tbe consignment of which tbe advances were expressly based. It cannot be said that tbe security was insufficient in amount. Tbe amount, for which security was required, was only $30,000. Tbe lien first taken was on tbe Clifton farm, of 530 acres, estimated at $60,000. This was all tbe security which Lawrence need have required; but be did not stop here. In addition to this, be required a pledge of tbe pork, lard, etc., put up at any period of tbe time of performance, in case of death or accident preventing tbe complete fulfillment of tbe undertaking on tbe paid of Clarkson. And even this was xiot all. He required tbe written pledge of Clarkson to give further security if deexned necessary.
*64 It is insisted, that it was the duty of Lawrence to have had the mortgage on the Clifton farm duly executed and recorded. This he might have done, but it was not essential, and would have made Grant & Stone no more secure than they were. The mortgage, taken as it was, became operative as an equitable mortgage inter paries, and held the land bound for the fulfillment of the engagement of Clark-son, to send forward the bacon. If Clarkson had failed to perform, this mortgage could have been enforced, in a court of equity, against the Clifton farm. This is settled beyond controversy. Sidle v. Maxwell, 4 Ohio St. Rep. 236; Bloom v. Noggle, Ibid. 45 ; and Fosdick v. Barr, 3 Ohio St. Rep. 471. The mortgage on the Clifton farm, therefore, was binding, and did hold the land as security, for the purpose and object contemplated by the terms of the arrangement, as presented and explained to Lawrence, and as he did, at the time, understand them. It is idle to say, that Clarkson might have taken the advantage of Grant & Stone, by giving some one else a mortgage on the premises, duly executed and recorded, or allowing judgment liens to attach, and thus deprive them of their lien. Lawrence knew the circumstances and disposition of Clarkson at the time; and the form of the security was wholly intrusted to Lawrence’s discretion. Suffice it to say, that the land was held as security by the equitable mortgage, without any intervening lien, until Clarkson had fully performed his contract, in the transmission of the bacon. Clarkson felt himself so far bound that, although the condition of the equitable mortgage had been fully complied with on his part, yet he would not execute the mortgage to the bank on the Clifton farm, until the equitable mortgage to Grant & Stone had been canceled. To charge Lawrence, therefore, with negligence because he did not, in the form of the security taken, provide against the risk of intervening liens which never occurred, and of which there was no danger, as he well knew, seems to me to be simply preposterous.
*65 But it is said that if the mortgage had been duly executed and recorded, it would have operated as a permanent security for the advances. There are two answers to this, either of which is conclusive. In the first place, permanent security was not required; all Grant & Stone asked was temporary and collateral security, which Lawrence was fully warranted in construing to he security for the transmission of the bacon, instead of security for any deficiencies in the sales of the article upon the anticipated consignment of which the advances were based. And in the second place, had the mortgage, as taken, been duly acknowledged and recorded, Grant & Stone would have been in no better condition than they were. The express condition of the mortgage was, that the mortgaged premises were to be held as security until the conditions of the agreement be fulfilled, as follows: “I to make them my exclusive agents for the sale of bacon I may ship east the coming season; not to send less than 500,000 lbs., but probably over 1,000,000 lbs. When the above conditions are complied with, this obligation to be void,” etc. Now, it cannot be pretended that Clarkson failed on his part in complying with these conditions. He made them his exclusive agents as stipulated; and he shipped to them over 600,000 lbs. of bacon, which they received in due season, and in good order. So that the condition of the mortgage having been fully complied with, on the part of Clarkson, the whole object of the security was accomplished, and the land no longer holden, and the mortgage void by its oion terms.
Much has been said about Lawrence surrendering the mortgage on the Clifton farm, and it has been more than intimated that it was done for the benefit of the Lafayette Bank. But what is the real state of the case? The condition of the mortgage having been fulfilled, it became wholly inoperative, and the surrender of it prejudiced no one. And it was not until Clarkson had satisfied Lawrence, from the evidence in his hands, that Grant & Stone had actually received bacon in Philadelphia, which, at *66 the prices at which it was then selling, was worth some $66,000, that Lawrence canceled this mortgage. And it does not appear that the mortgage to the bank was necessary for its safety. J. C. Ludlow, as it appears, became substituted as security on Clarkson’s paper to the bank for Thomas D. Corneal, on the faith that the mortgage should be taken and held as the primary security. It does not appear but that the bank was abundantly secure in the responsibility of Corneal. And for aught that appears, a change of security was all that was required, and all that was effected by the bank.
Now, it is perfectly clear, if the security required by Grant & Stone was merely temporary and collateral to Clarkson’s engagement to send forward the bacon, there cannot be the slightest pretense for charging Lawrence with negligence: First, because he took all the security, and even greater precaution than was actually requisite; and second, because Clarkson fulfilled, to the very letter, his engagement to transmit the bacon. If, however, the security required was not merely temporary and collateral, but permanent security against the ultimate contingency of the sales of the article on the consignment of which the advances were based, in case it should prove insufficient to cover the whole extent of the advances, then it is equally plain that Lawrence is not liable, for the reason that he was misled by the loose, indefinite and ambiguous manner in which Grant & Stone prescribed the terms on which the security was to be taken.
This is conclusive of the whole case. For if Lawrence was not liable for negligence occurring before the delivery of the article upon which the advances were made, he could not be made liable at all. The subsequent efforts of Lawrence to secure Grant & Stone by the mortgage on Clarkson’s pork house and country seat, etc., were made without direct instructions from Grant & Stone, and because they expressed dissatisfaction, and set up the claim that the security ought to have been permanent security *67 for their advances, liabilities, etc., instead of temporary and collateral security.
And even had Lawrence been guilty of negligence in regard to the first security taken, their continuing him as their agent, and sanctioning his subsequent acts in taking security, after a full. knowledge of his previous acts, amounted to a tacit ratification of his prior acts, and a waiver of all claim against him on that account.
But if the security required by Grant & Stone had been permanent security for the advances, charges, etc., instead of the temporary and collateral security taken, and Lawrence had been guilty of gross negligence, he was not liable in damages to Grant & Stone on the conditions prescribed by them in their letters to Clarkson, under the authority of which he acted. One of the express conditions was, that the produce to be sent forward by Clark-son, was to be sold in the spring op 1839. The security was taken by Lawrence, under the condition in the arrangement expressly provided by Grant & Stone, that their acceptances were to be based on anticipated consignments of at least 500,000 lbs. of bacon, to be sold on Clarkson’s account “ the next spring.” The time when the bacon was to be sold was made a material stipulation in the arrangement. And in taking and holding security, Lawrence had a right to act on the assumption that Grant & Stone would, on their part, conform to the terms of the arrangement under which they asked to be secured. And after Lawrence had taken security with reference to a sale of the bacon in the spring, and that which would have been sufficient, had the article been sold in the spring, it was certainly not within the competency of Grant & Stone, under any new arrangement with Clarkson, to subject Lawrence to any liability for neglect of duty, by an extension and change of the time for the sale of the bacon.
• Had Lawrence stood in the position of a surety for Clarkson, his liability would have been discharged by the *68 extension of the time for the sale of the bacon, without his consent. Where a creditor, without the express assent of the surety, agrees to and does give time to the principal debtor, he, by so doing, discharges the surety. No principle is better settled than that a surety is released by any arrangement of the principal and the creditor, whereby the terms of the original contract are varied in any material particular which increases the risk of the surety. In Miller v. Stewart, 9 Wheat. Rep. 703, Mr. Justice Story said:
“Nothing can be clearer, both upon principle and authority, than the doctrine that the liability of a surety is not to be extended, by implication, beyond the terms of his contract. To the extent, and in the manner, and under the circumstances pointed out in his obligation, he is bound, and no further. It is not sufficient that he may sustain no injury by a change in the contract, or that it may even be for his benefit. He has a right to stand upon the very terms of his contract; and if he does not assent to any variation of it, and a variation is made, it is fatal. And courts of equity, as well as of law, have been in the constant habit of scanning the contracts of sureties with considerable strictness. The class of cases which have been cited at the bar, where persons have been bound for the good conduct of clerks of merchants, and other persons, illustrate this position. The whole series of them, from Lord Arlington v. Merrick, (2 Saund. 412,) down to that of Pearsall v. Sommersett; (4 Taunt. 593,) proceed upon the ground that the undertaking of the surety is to receive a strict interpretation, and is not to be extended beyond the fair scope of its terms.”
In 2 Caines’s Cases in Error, 57 and 58, Chancellor Kent said:
“ It is a well settled rule, both in law and in equity, that a surety is not to be held beyond the precise terms of his engagement. This rule is founded on the most cogent and salutary principles of public policy and justice.
“ In the complicated transactions of civil life, the aid of one friend to another in the character of surety or bail, becomes requisite at every step. Without these constant acts of natural kindness and assistance, the course of business and commerce would be prodigiously impeded and disturbed. It becomes, then, excessively important to have the rule established, that a surety is never to bo implicated beyond his specific engagement. Calculating upon the exact extent of that engagement, and having no interest or concern in the subject matter for which he is surety, he is not to bo'supposed to bestow his attention to the transaction, and is only to bo prepared to meet the contingency when it shall arise, in the time and mode prescribed by his contract. The creditor has no right to increase his risk without his consent; and cannot, therefore, vary the original contract, for that might vary the risk.”
To prevent tke surety from being discharged by the *69 novation with the principal, the knowledge of the surety is not sufficient. He must consent to remain bound. Edwards v. Coleman, 6 Monr. 575, 576. An acknowledgment of the surety that he remained bound, made in ignorance of the effect of the novation between the creditor and principal, is not obligatory. 7 Monr. 541.
Now, although Lawrence occupied the position not of a surety for Clarkson, but of an agent for Grant & Stone, and his liability, if liable at all, was a liability ex delicto, and not a liability ex contractu, yet the principle of his liability was based on the terms of the contract arrangement out of which Lawrence’s duty originated, and was governed by a rule more absolute, and more certainly to be affected by any alteration of the terms of the contract than it would have been in case of a surety. For had Lawrence been a surety, a change in the contract by an extension of the time for the sale of the bacon, with his express assent, might not have operated to discharge his liability; yet his liability as agent must have arisen, if at all, on the original terms of the contract, and could not have been predicated on the arrangement as subsequently altered, even had the alteration been made with his assent. His duty to take security arose on the agreement for security for the advances based on anticipated consignments of at least 500,000 lbs. of bacon to be sold the next spring. The extent of the consignment, and the time of the sale being material conditions, the neglect, if any occurred, consisted in the omission or insufficient performance of the duty arising on these conditions. If the security taken was fully sufficient to cover all advances on condition of the sale of the bacon in the spring of 1839, it was all that was asked in the written terms of Grant & Stone, and all that could have been required of Lawrence. If the bacon transmitted was sufficient to cover the advances, charges, etc., of Grant & Stone, had it been sold in the spring of 1839, as provided in the written terms on which Lawrence acted, he could not have been liable. If, however, the bacon *70 could not have been sold tbat spring for sufficient to cover tbe advances, charges, etc., and Lawrence bad been liable for gross neglect in regard to taking security, the extent of bis 'liability could not bave exceeded tbe difference between tbe market value of tbe bacon in tbe spring of 1839, and tbe amount of tbe advances, charges, etc., up to tbat time. And even on tbat, he would bave been entitled to a deduction to tbe extent of tbe value of any security which be procured and held for them. Now, it appears to be an uncontroverted, and an incontrovertible fact, tbat tbe bacon transmitted at tbe prices at which it was saleable in Philadelphia in May, 1839, was fully, and more than sufficient to cover all tbe advances, charges, liabilities, etc., of Grant & Stone. Tbe taking of tbe security was entrusted much to the discretion of Lawrence; and it will not be pretended tbat in June, 1839, there was any ground to charge him in damages for neglect of duty. If liable at all, bis liability, however, was complete in tbe spring of. 1839, when tbe bacon was to have been sold. And it was not in tbe power of Grant & Stone to create a liability on tbe pai't of Lawrence for neglect, by extending the specified time for tbe sale of tbe bacon, even had Lawrence expressly assented thereto. If there was a misfeasance or non-feasance, it bad taken place, bad occurred, was consummated, prior to June 1839, and Grant & Stone, after tbat time, could neither bave created nor enlarged it by changing tbe contract and extending tbe stipulated time for tbe sale of tbe bacon by any agreement with Clarkson. To say tbat a factor, having prescribed terms on which bis agent is to take security for advances based on anticipated consignments of produce, to be sold at a specified time, may, after tbat time arrives — notwithstanding, bad tbe sale been made at tbat specified time, tbe security would bave been abundantly sufficient — extend the time of sale in anticipation of larger profits, and in case of misfortune by so doing, charge bis agent not only with neglect, but gross neglect of duty, and throw upon him all *71 the consequences and loss of large profits, from a hazardous adventure in the produce business, is too monstrous and preposterous a proposition to admit of serious discussion.
Not only did the written terms on which Lawrence acted in taking the security, expressly provide for the sale of the bacon in the spring, but even without such a stipulation, Grant & Stone had the right, as the factors of Clark-son and consignees of the article on which they had made advances, to sell the bacon at any time after delivery, even contrary to the express wishes of Clarkson, with a view to reimburse themselves for their advances. But it does not appear that Clarkson, by any specific instructions, ever did, in fact, attempt to restrict their discretion as to the time of the sale. True it is, he expressed a wish not to have his produce forced into market, and sold at a sacrifice, as he had confidence that the late market would be good. And in his letter of March 4, 1889, he added: “ You shall have ample means in your hands, so far as good bacon is a substitute for money.” And again, in his letter to them of April 13th, 1839, he said: “If you find it inconvenient to take up the bills, or any part of them, without funds furnished you, I must ash you to do the best you can to get good prices, and sell the bacon to meet the drafts. I am clearly of opinion that late sales will be the best, but if I can’t hold on, I must sell early.” This was in reply to their letter to him of April 3d, in which they had said, “we can’t, without inconvenience, meet your bills, but must depend on you,” etc. In their letter of the 17th of April, they said, in regard to the sales: “ We shall do the best toe canfor your interest.” And Clarkson, in his letter to them of May 10, touching the same matter, said, “ do the best you can.” The selling of the bacon in the spring, therefore, was, in every view of the subject, committed entirely to the discretion of Grant & Stone, and depended on the exercise of their judgment, with the superior opportunities of knowing the prospective state of the market at Philadel *72 phia. And after mention of sales of some of Clarkson’s bacon, at prices satisfactory to him, Grant & Stone said, in their letter to him of the 16th May, ’39: “ We have held back while the market has been supplied from those who sold to meet their engagements, and those who had poorer stuff, and were disposed to push it off. Our market will now be healthier, and we can go on to make sales at good prices soon.” In their letter of July 12, they say: “ We fear toe have missed it by holding on and not selling freely in the spring,” etc. And Clarkson, in his letter to them, in reply, July 19, said: “I fear, with you, we have missed the most favorable time for selling.” And, again, in their letter to him of July 27, they said: “It certainly appears now as if we had missed the right time for sales; but we felt such a strong disposition to meet your views, and be governed by your better judgment, that we stored your bacon carefully away, and went on to close every other hogshead consigned to us, calculating you were to reap the golden harvest from late sales. We repeatedly refused to sell when we could have done so to some extent, preferring to hold for better prices ; but the scene has changed, and we must now do the best we can.”
Now, Clarkson did not require the time of selling to be extended. All he did was to express his wish that the bacon might, not be forced to sale at a sacrifice, and to indicate his confidence in the late market prices. And inasmuch as they had said they found it inconvenient to take up the bills on which the advances had been procured, he said to them, “ I must ask you to do the best you can to get good prices, and sell the bacon to meet the drafts.” Thus, not only had Grant & Stone the legal right, but they were directed by Clarkson to sell the bacon to meet the liabilities for the advances. Yet, in the exercise of their own discretion, and with a view to larger profits to themselves as well as Clarkson, they chose to extend the time for selling. It appears in the case, and is beyond controversy, that, had the bacon been sold at the prices it would have *73 brought the latter part of May, it would have supplied a fund of more than sixty thousand dollars — would have covered all advances, liabilities and expenses of Grant & Stone, and left a balance of several thousand dollars for Clarkson. "Who was, then, in fault in deferring the sales ? Grant & Stone had opportunities of knowing the state of the market, and prospect of better prices in Philadelphia, which could not possibly have been within the reach of Clarkson. They were directed to sell to the best advantage, and meet the drafts; yet, in expectation of higher prices and larger profits, they determined to hold on and extend the time of selling the bacon. It is true, Clarkson assented to it, but Lawrence was not consulted, and it does not appear that he assented to it; nor would it make any difference if he did. He was only required to take security on the condition of the sale of the bacon in the spring of 1839, and for this purpose his security was ample. If Grant & Stone, in anticipation of larger profits, chose to extend the time of sale, and thus, by a mistake of their own, brought loss upon themselves, and ruin upon Clark-son, I know of no principle of justice by which they can throw the consequences of their own mistake upon Lawrence, and thus by a subsequent change of the terms on which he was to take the security, visit the disaster of a commercial adventure, occasioned by their own error, upon an uncompensated agent. That would be to first mislead a friend by the ambiguous terms on which his gratuitous assistance was solicited, and then entrap him by a change of one of the express conditions on which his friendly interference was rendered. So monstrous a proposition can never have my assent.
Upon no principle of justice and right, and in no view of the case, which I can take, therefore, can Lawrence be made liable as a gratuitous agent for negligence, in the taking and holding of security prior to the transmission of the bacon.
*74 But, it is urged, that Lawrence is liable for gross negligence in taking the subsequent security on the pork house and country seat; and on learning the insufficiency of this, in not taking additional security. The taking of this subsequent security was a voluntary act on the part of Lawrence, and not required by any instructions of Grant & Stone. It was done to satisfy them, as they were then setting up the claim that the security required by them was to have been permanent, instead of temporary and collateral security. And Clarkson said that he gave this security to relieve Lawrence’s feelings caused by Grant & Stone’s complaint, and not because he was bound to them to do so. Now, if Lawrence, admitted to have been at the time a man of at least ordinary care and prudence in his own business, acted in the premises with that diligence he would have used had the business been his own, it must be conceded that he did not become liable.
It is essential to a correct understanding of this matter, to go back to the period of the transaction, and consider it in the view taken of it by the parties themselves, at that time, when the extent of the losses on pork and bacon that season, and the great fall in the price of real estate, were not anticipated. At that period, August, 1839, no one anticipated Clarkson’s failure, and such was his standing that his word would have been relied upon by the most prudent of business men in Cincinnati. And although he then contemplated a loss on his pork operations that year, and that he would be hard pressed, yet it appears from his letter of the 19th August, 1839, that he supposed he had “property enough to pay all Us liabilities, at a fair price, and leave him some $200,000 of growing property.”
It appears from the letter of Grant & Stone of the 27th of August, 1839, to Lawrence, and also that to Clarkson of same date, that the extent of the security they claimed that Lawrence should hold, was $30,000. It was under this claim of Grant & Stone, that Lawrence took the subsequent security; and all he was bound to do was to take *75 and "hold security, which, in the exercise of an honest judgment, he estimated to be good for $30,000. Now, it appears from the deposition of Clarkson, and the letter of Lawrence to Grant and Stone of September 2d, 1839, that the Graham Country Seat was estimated to be worth $15,000, and the pork house $35,000, making an aggregate of $50,000. But there was an incumbrance on it estimated by Lawrence to be about $8,000. So that, he represented the property upon which he took the mortgage to be fairly worth about $40,000, which estimate appears to be sanctioned by the opinions of competent judges of its value at the time. But it appears that, as things resulted, there was a mistake as to the extent of the prior incumbrances on this property; that instead of $8,000, the prior incumbrances turned out to be about $21,000, making the security worth $13,000 less than Lawrence’s estimate. Deduct $13,000 from $40,000, and the value of the security taken would still be $27,000, which would be $2,000 more than the balance found to be coming to Grant & Stone on the settlement with Clarkson. And unless Lawrence is to be made responsible for the great fall in the price of real estate, which followed the commercial revulsion of 1839, he could not be made liable in damages for gross neglect in taking this security in August, 1839.
It is said that Lawrence was negligent in trusting to Clarkson’s representations as to the extent of the incumbrances on the pork house. But it must be recollected that Clarkson was at that time in good standing, and his word deemed worthy of reliance by prudent business men at Cincinnati. Besides, not then apprehending insolvency, but confident of his means being sufficient, after the payment of all his liabilities, to leave him some $200,000 in “ growing property,” he had no motive to deceive Lawrence as to the incumbrances on the property. Lawrence was not required to perform the duties of an attorney at law, or a compensated agent, in the examination of records and the investigation of titles, or in inquiries after *76 incumbrances, whether on record or not, and uncertain in extent. Grant & Stone having chosen to avail themselves of the gratuitous services of Lawrence, with a full knowledge of the pressure of his extensive engagements in business, rather than incur the expense of employing an attorney, they cannot now complain that Lawrence did not use the exertion and spend the time in their business which might have been expected from a feed attorney. There appears to be a discrepancy between the testimony of Lawrence and that of Clarkson, touching the latter’s statements to the former in relation to the incumbrance on the pork house. Lawrence has no recollection of Clark-son informing him of the mortgage of the United States Rank; while Clarkson is positive in his recollection, that he did disclose the matter as it was, and says that the mortgage to Boyd & Co. was fully explained to Lawrence, at the time, as a mortgage given to secure the delivery of barreled pork, etc., and to cover their liability for him; and that he showed Lawrence the letters of Boyd & Co., acknowledging the receipt of between 200 and 300 bbls. pork, chiefly mess, then worth $22 per bbl., from which facts Lawrence concluded the mortgage to Boyd & Co. was an incumbrance to no great amount, etc. Now, the probability is, that, inasmuch as the mortgage to the U. S. Bank was only for between five and six thousand dollars, Lawrence calculated at the time, the whole incumbrance on that property at about eight thousand dollars. But in consequence of the great disasters in the pork trade, the Boyd & Co. mortgage amounted to far more than was anticipated. But for the losses on the pork delivered to Boyd & Co., and the great fall in the prices of real estate, the mortgage on the pork house and country seat would doubtless have covered the whole balance finally found to be coming from Clai’kson to Grant & Stone. It is not very remarkable that in a transaction of such extent there should be some conflict in the recollection of witnesses. Lawrence testifies that he acted in the pi’emises as if the *77 case liad been bis own. And if we look back to tbe time and tbe circumstances attending bis acts, it is fair and reasonable to infer, that be would not have thought it necessary to have used greater diligence bad tbe transaction been bis own.
"When Lawrence discovered that tbe incumbrances on tbe pork bouse were likely to be greater than bad been expected, and that real estate was falling in price, be called on Clarkson for further security. But Clarkson absolutely refused to give Grant & Stone any further security, claiming that be was not bound to do so. Lawrence certainly could not have become liable for negligence in not taking security, when it could not have been obtained. Prior to this, Lawrence bad not been guilty of neglect, certainly not gross neglect. "Without instructions be bad taken all tbe security be could get, after Grant & Stone bad set up a claim to permanent instead of temporary security. Now, bow absurd to charge him with neglecting to obtain that which was not to be bad, and that, too, which be bad'not been, in fact, instructed to take.
Clarkson, however, in order to relieve Lawrence’s feelings, gave him tbe indemnity mortgage, declaring it to be positively for bis (Lawrence’s) indemnity, and not for Grant & Stone’s security. And Lawrence says that be received it, thinking that it might be available to Grant & Stone. And to make it available as far as practicable, be afterward made a voluntary transfer of it to them, without any charge being made by them that be bad become liable for negligence.
But Lawrence’s labors of friendship did not stop here. In October, 1839, be advised Grant & Stone to employ a special agent to see to their interests in tbe transaction with Clarkson. This they declined to do. Still, Lawrence continued bis attention to their interest, and urged Clark-son to settle tbe balance, by turning out real estate to Grant & Stone, at a fair valuation, to be estimated by disinterested persons. To this Clarkson assented, and *78 wrote to Grant & Stone — Jan. 8, 1840 — and proposed to turn over to them property, including his home and place of residence, “ if they would meet him on living terms.” But they declined the offer, saying that nothing but money would answer their purpose.
It may be here remax’ked, that the want of foresight as to the x-esult of this commercial adventure, was liot wholly on the part of Clarkson and Lawrence. In their letter of the 14th of September, 1838, Grant & Stone said: “ We can dispose of a great deal of bacon; and if you make us your sole agents, and allow us to use our neighboring markets, you cannot send us too much.” This was calculated to mislead Clarkson. And although they were unable to dispose of the amount of bacon transmitted by Clarkson, and suffered a part to spoil on their hands, yet they higgled and complained, after the disaster of the adventure became apparent, that Clax’kson had not sent them more. They were bound, by the express terms of their own arrangement, to sell the bacon in the spring of 1839; yet, in the exercise of their own judgment and volition, they defex’red the sale; and afterward, in their letter of July 16th, 1840, said: “ The first error (not selling in the spring) was the grand one, followed by a great pressure in the moxxey market, a depression in price, deterioration in quality, etc.” They were loose and ambiguous in their instructions as to the security required; first requiring only temporary and collateral security, axid afterward, when apprehensive of an unexpected failure in the enterprise, ixisisting that the security should have been permanent and direct, to cover ultimate results. It is not averred in the pleadixxgs, nor is it claimed in the argument, that there was any bad faith on the part of Lawrence. It is not denied, that Clarkson faithfully expended the money advanced in the purchase of the pork, and in curing and sendixxg forward the bacon; and that he transmitted over 100,000 lbs. more than the minimum amount required by his contract. It is not to be denied, that, had the bacon been sold in the spring, according *79 to the written terms of the agreement, the sales would have covered all advances, liabilities, and expenses. It is not to be denied, that Grant & Stone had the right to sell the bacon at any time after delivery, and that the deferring of the sales was their own act, even if it were in compliance with a qualified request by Clarkson. Under such circumstances, wben Clarkson bad lost all bis own labor and expenses, and all bope of benefit from tbe enterprise, and by tbe unforeseen and unexpected disasters in business and fall in tbe prices of all property, bad actually become bankrupt; .and wben “the grand error (not selling in tbe spring),” arose from tbe mistake and bad judgment ot Grant & Stone themselves, to allow them to throw tbe loss and result of tbe whole failure of tbe adventure upon Lawrence, a gratuitous agent, for an act designed as a mere matter of accommodation and friendship, and without tbe promise or bope of reward or profit therefrom, strikes me as a flagrant disregard of every principle of equity and startling to a true sense of justice.
There is another view of this case, which appears to me to be equally clear and conclusive against tbe complainant in review.
Grant & Stone can bave no relief under this mortgage to which Lawrence himself would not bave been entitled. If there be any thing well settled, either in law or equity, it is this, that tbe assignee of a security not negotiable can acquire no right superior to that of tbe assignor. Now, what is tbe real nature and effect of tbe right which Grant & Stone acquired by tbe transfer to' them of Lawrence’s indemnity mortgage ? Tbe language of Lawrence’s assignment is: “ For value received, I hereby assign all my interest in .the within mortgage to Grant & Stone.” "What was Lawrence’s interest in this mortgage ? Tbe mortgage effected a security for a contingent agreement; and tbe mortgage was only an incident to that agreement. Clark-son agreed to indemnify and save Lawrence harmless *80 against any suit or claim which Grant & Stone might bring against him for any neglect to take sufficient security, or neglect to hold on to security when taken; and the mortgage was given as the security for this agreement. The agreement and mortgage were personal to Lawrence, and exclusively for his benefit, and not security for the payment of Clarkson’s debt to Grant & Stone. The mortgage, by its express terms, was operative only to indemnify Lawrence and save him harmless against loss and damages. It was not a negotiable instrument. If Grant & Stone acquired any right by Lawrence’s assignment to them, it was only such as had accrued to Lawrence, and such as they could work out and enforce through him. The court can neither make a contract for the parties, nor enlarge or change the terms of the contract which the parties have made for themselves. It is preposterous to say, that Grant & Stone can claim any right under this mortgage, except such as actually accrued to Lawrence, and such as he could have enforced against Clarkson had the mortgage not been assigned. And suppose the mortgage not assigned by Lawrence, and that he had brought suit against Clark-son to enforce it, how far could he have gone in his suit without alleging and proving that he had been damnified ? If, to such a suit, Clarkson had come in and set up as a defense, that not only had Lawrence been subjected to no damages, expenses, or costs — but further, that Grant & Stone had not actually asserted or preferred any claim against Lawrence for damages, on account of negligence on his part, would any person have seriously questioned the effect of such a defense ? There cannot be a doubt as to the general proposition, that in order to recover on a bond of indemnity, actual damage must be shown; and a mere legal liability to pay is not, in itself, sufficient. Chasc v. Hinman, 8 Wend. Rep. 456.
There is a manifest and well-defined distinction between a covenant to indemnify and an agreement to pay. In the former, it is a condition precedent that the party to be *81 kept harmless should be damnified before he can demand the indemnity from the property pledged; while in the latter, the property may be treated as being held in trust for the payment of the debt. This distinction arises from the essential terms and condition of the agreement itself. Where a surety receives property from the principal debtor to be applied in payment of the debt, either the surety may proceed, before he is sued, to dispose of the property in order to satisfy the debt, or the creditor may proceed directly against the property as"the property of the principal, without judgment against the surety. But where the security given is conditioned for the mere protection of the surety, to save him harmless from his liability or from loss or damage therefrom, it is personal to the surety and for his benefit; and in such case, the creditor can reach the property only through the equities of the surety, and can never be subrogated to the rights of the surety until the contingency has occurred upon which the surety can proceed against the principal debtor. In Kramer v. The Farmers & Mechanics’ Bank of Steubenville, 15 Ohio Rep. 253, it was insisted that, although judgment had been obtained against the surety, yet as he had paid nothing, the property mortgaged to him as indemnity could not be reached. But the court held, that “ in consequence of the rendition of the judgment against the surety, he was so far damnified that he might, with propriety, have the property mortgaged to him sold, under proceedings in equity, to satisfy the judgment.” And in McConnell v. Scott, Ibid. 401, the decision of the court was to the same effect. And in The Ohio Life Ins. & Trust Company v. Reeder, 18 Ohio Rep. 35, it was directly decided, that “ the creditor can only be substituted to the rights of the surety, and the surety is not damnified until judgment has been rendered against him.”
A surety cannot proceed against his principal in an action at law until he has actually paid the debt. But it seems that, in equity, a surety is so far favored, that he may proceed against the property mortgaged for his in *82 demnity after judgment against Mm. In equity, the surety is treated as having been damnified, when judgment has been taken against him and his property has become liable to be taken in execution for the payment of the debt. But there is no instance in which it has been held, that a surety could demand indemnity from the property pledged under a mortgage to keep him harmless, until he was damnified. According to Burge on Suretyship, 320, “ a surety who receives an indemnity can have no claim until he has been damnified.” And again, 479, same work: “ If the principal has given to the surety a bond of indemnity merely, the surety must prove that he has been damnified; the bond is then forfeited, and the surety may proceed.” And in Homer v. Savings Bank of New Haven, 7 Conn. 483, the court, after reviewing the cases on the subject, concludes, “that where the security is given to the surety for his own protection, the creditor can only claim through him, and must be subject to all his equities.”
Now, even if Lawrence had become liable to Grant & Stone for negligence, and such liability could place him in the position of a surety for Clarkson, yet Grant & Stone could not enforce the indemnity mortgage, upon the principle of subrogation; for Lawrence, not having been damnified, or his liability fixed by judgment, the contingency had not occurred upon which alone the mortgage could become operative.
But the case under consideration is even stronger for the application of the rule, that the mortgagee must be actually damnified before the mortgage can be enforced, than the case of a surety. Lawrence does not stand in the position of a surety for Clarkson. He never obligated himself, by any contract, to pay money to Grant & Stone for Clarkson. If he became liable to Grant & Stone at all, his liability was ex delicto and not ex contractu; and instead of standing in the position of a surety for Clarkson, the latter had actually become a surety to him, for any liability he might have incurred to Grant & Stone, for neglect of duty as *83 their agent. And inasmuch as the mortgage was conditioned simply to protect Lawrence from damages or loss, on account of any claim which Grant & Stone might bring against him on a charge of negligence, the condition could not have been broken until Lawrence was actually damnified. And inasmuch as Lawrence not only was not actually damnified, or placed in a condition in which he was legally required to pay a single dollar on a charge of negligence against him, but no charge of liability for negligence was actually and in fact preferred by Grant & Stone, I am wholly unable to perceive upon what ground it can be claimed that the contingency had happened on which the condition of the mortgage depended. Giving Grant & Stone, therefore, the relief sought, seems to me to be not only conceding to them a right, under this indemnity mortgage, superior to that which Lawrence could have exercised, but allowing them to enforce it, even against a subsequent incumbrancer, without condition broken.
It is argued, that Lawrence, by giving up security taken, and also by afterward taking insufficient security, became liable to Grant & Stone as a surety or guarantor for Clark-son. But how could this be ? The contract of a surety or guarantor is never implied, and can be created only by express agreement. And it cannot be seriously pretended, that there is any proof in the case even tending to show that Lawrence ever agreed to become a surety or guarantor for Clarkson. His undertaking, to act as the agent of Grant & Stone, was a distinct and independent verbal agreement of his own, and not the collateral and accessory obligation of a surety or guarantor. And the liability of Lawrence, if he could have become liable at all, must be a liability sounding in tort and not in contract. It is true, there is a class of cases in which the demands made by principals against their agents may be said to arise, either from the breach of the agent’s contract, or from the violation of his duty, and that either the action of assumpsit or the action on the case may be used; in the one instance the *84 ■proceeding being ex contractu, and in the other ex delicto. But this case does not fall within that class; for Lawrence’s undertaking was wholly gratuitous, without compensation, and, therefore, without consideration as a contract. He could not be made liable to an action ex contractu for a breach of his gratuitous undertaking; but although an uncompensated agent, it became his duty to exercise some degree of diligence in the business he voluntarily took upon himself, and would be liable for any damage resulting as the immediate and direct consequence of gross neglect of duty. Had Grant & Stone sued Lawrence and recovered a judgment for damages, it could not have affected their remedy against Clarkson. It is true, that in a suit against Lawrence for neglect of duty, the solvency of Clarkson, and the value of the claim against him, might be inquired into; but in a suit by Grant & Stone against Clarkson on his contract, a recovery by them in damages against Lawrence for negligence, could neither be pleaded in bar by Clarkson, nor set up in mitigation.
It is argued for the complainants in review, that, by the transfer of the mortgage to Grant & Stone, and the circumstances attending that arrangement, Lawrence tacitly admitted his liability, and also that he and Clarkson thereby tacitly agreed that the mortgage should be available as a security to Grant & Stone. To this there are several answers, either of which is conclusive. In the first place, if Lawrence, under a misapprehension or mistake of the real fact, had supposed that he might possibly have made himself personally liable, and, therefore, had made a direct admission of his negligence and an express declaration of his intention to pay the loss, it would not have been sufficient to charge him. If he was not in fact guilty of gross negligence, a mistaken admission of negligence and declaration of an intention to pay, could not have been binding on him. The reasoning and decision of the court, in Sodowsky v. McFarland, 3 Dana Rep. 207, is conclusive and unan *85 swerable on this point: “ The testator may have believed that he had been negligent, and have, therefore, felt conscious of some honorable obligation; but, nevertheless, he may not have been grossly, or even ordinarily negligent, and may not have incurred any legal liability.”
And in the next place, a tacit admission is never presumed in opposition to positive proof repelling it. Lawrence testifies that he never did, either at the time of the settlement in October, 1840, or at any other time, admit his liability to Grant & Stone. And how could Lawrence and Clarkson, or either of them, be taken as admitting Lawrence’s liability at the time of the transfer of the mortgage, when Grant & Stone not only said nothing about it during that transaction, but never at any period prior to that had charged it ? Lawrence says, in his deposition: “ They” (Grant & Stone) “ never set up any claim against me as individually liable for Clarkson’s debt.” It is not pretended in the averments, of either Grant & Stone’s answer to the original bill or in their bill of review, that they ever had, prior to the commencement of the original suit, preferred a claim against Lawrence as individually liable, or requested him at any time to pay any amount on Clark-son’s debt. The evidence and exhibits in the case leave no ground for controversy upon the subject of what the parties contemplated at the time of the transfer of Lawrence’s mortgage. Grant & Stone themselves furnish the key to the whole difficulty on this point, by their answer to the original bill, when they “ aver that Lawrence took the mortgage for them, and that he and Clarkson intended it to secure any balance that might be due them. That whether Lawrence is liable or not, the mortgage inures to their benefit, is subsisting, and the first lien on the property.” Without being sufficiently vigilant to look into the peculiar terms of the indemnity mortgage, and ascertain accurately its true legal effect, they acted on the mistaken supposition that it would inure .to their benefit without Lawrence being damnified, and whether he was liable for *86 negligence or not. And Lawrence appears to have been laboring under the same mistake. At the time this mortgage was given, Clarkson absolutely refused to give any additional security to Grant & Stone, hut consented to give this mortgage, “which he repeated to S. P. Chase, in strong terms, was exclusively for the benefit of Lawrence.” (See Dep. of S. P. Chase, and also that of Clarkson.) And Lawrence, in his answer to the original hill, said: “ But, concluding security to himself was available to them ” (Grant & Stone), “ he took the mortgage and had it recorded, without his attention being called to the peculiar language of the condition. When Grant & Stone settled with Clarkson, respondent assigned the mortgage to them,'not doubting it was a good and valid security to them, and tbe first and best lien on the premises.”
And, it appears, that Clarkson acted under the impression that the assignment, or rather his own consent to the assignment, operated as an equitable mortgage to Grant & Stone; for in his answer, filed May 6, 1847, to Grant & Stone’s cross hill, which, being responsive to the bill, is evidence, he said:
“ This respondent does not admit that the said Grant & Stone have any right whatever to have said mortgaged premises subject to the satisfaction of the debt due from this respondent to said Grant & Stone, by reason of any negligence or misconduct of said Lawrence in taking or surrendering security for said Grant 8f Slone, but, on the contrary, expressly denies that’ they have any such right. This respondent admits that the said Lawrence did apply to him, in September or October, 1839, for further security to said Grant & Stone, upon their transactions with this respondent in the provision business, but this respondent expressly refused to give any further security, believing that he bad already more than complied with his contract with them as to giving security. Inasmuch, however, as the said Lawrence expressed some apprehension that he might be held personally liable by the said Grant & Stone, for his action in relation to securities to be taken from this respondent; this respondent was willing, though fully satisfied that said Lawrence was not in fact liable to them, to indemnify him against any such liability, and accordingly executed and delivered to him the said mortgage, without ant consideration whatever, but from a wish only to relieve said Lawrence from apprehension and uneasiness. This respondent denies that the said Lawrence has in any way been made, or can in any way be made, liable to the said Grant 8/- Stone for any of the causes mentioned in the condition of said mortgage, and insists that neither the said Lawrence, nor the said Grant Sf Slone, have any right to subject said mortgaged premises by *87 reason of any such liability. This respondent, however, admits that, on the 17th day of October, 1810, he did, by memorandum indorsed upon said mortgage, agree that the same should be held for the payment of the balance ascertained to he due by this respondent to the said Grant & Stone, and he supposes that said memorandum inured as an equitable mortgage of said property to said Grant Stone from the date thereof.” 1
And again, Lawrence, in Ms deposition, testifies: — “ Grant $ Stone made no claim against me as personally liable, at the time of their settlement with Clarkson, in October, 1840. I received no consideration for the assignment of the mortgage. The object of the assignment toas, simply, to vest in them what- ■ ever right I held.” It must be borne in mind that, at the time of this transaction, in October, 1840, the insolvency of Clarkson had not been ascertained; that, by the credit allowed him on the balance ascertained by the settlement to be coming to Grant & Stone, he expected to be able to meet his liability; that the pork house property had not been sold, and its insufficiency to pay prior liens not ascertained ; that the Graham country seat was at that time estimated by Clarkson at $15,000, and by Grant at $12,000; and that the most rapid decline in the price of real estate about Cincinnati, was in 1841, 1842, and part of 1843. (See Dep. of Isaac D. Wheeler.) It is clear, therefore, from the testimony of the parties, their conduct, and the attending circumstances, that the assignment of the indemnity mortgage to Grant & Stone was a mere matter of precaution, without the necessity of a resort to it being known, or, perhaps, seriously anticipated. Hence the assignment was made without any particular examination of the special terms of the mortgage, and under a mistake as to its true legal effect and operation. And this misapprehension of the parties to the transaction, cannot have the effect to change the terms or legal effect of the mortgage, especially to the prejudice of a subsequent incumbrancer.
It is argued, that if the mortgage, by virtue of the assignment, did not inure to the benefit of Grant & Stone, the transaction would prove idle and of no effect, and the intention of the parties be defeated. Be it so. The terms *88 of the agreement could not be changed, and a legal effect given to it prejudicial of the rights of the subsequent incumbrancer, not a party to it, by showing that the parties had acted under a mistake, either of the law or the fact. It would work a fraud upon the rights of Ludlow to allow Lawrence, by any kind of concert with Clarkson, and Grant & Stone, to give effect to his mortgage by admissions at variance with the true and real state of the case. And an agreement, by Lawrence and Clarkson, that the mortgage should stand as security to Grant & Stone as the first lien on the property, could have no effect against Ludlow.
The complainants in review are not in a condition to claim much latitude in the way of tacit admissions from the conduct of parties. If they had any serious claim against Lawrence individually, why did they not at least request of him some payment ? Why did they not take some steps to ascertain and fix his liability ? Why allow Clarkson an extended credit of three years, at the time of the settlement in October, 1840, without even calling upon Lawrence for the payment of a single dollar ? Why did they omit to bring suit, and attempt to entitle themselves legally to the benefit of Lawrence’s indemnity mortgage by the recovery of a judgment against him? Why did they even forbear to charge Lawrence with being individually liable, until the filing of their answer to the original bill, in May, 1843; and even then insist that they were entitled to the benefit of his mortgage, without his being liable ? Why, after the decree against them in the supreme court of Hamilton county, in April, 1847, did they sleep upon their claim, and allow the decree to remain undisturbed until the statutory bar of “five years ” had almost run out, and until the heirs of Ludlow, under the belief that they were free from further demands, had divided the remnant of their inheritance, before they filed their bill of review ? If all this conduct did not amount to a tacit admission, that they had no claim against Lawrence, it at least man *89 ifested a very great want of confidence in its justice and validity.
"What, then, did the assignment of the indemnity mortgage to Grant & Stone, before condition broken, amount to ? Before tbe mortgage bad become operative, according to its own terms, witb wbat rights could tbe assignment of it have clothed tbe assignees ? Lawrence testifies that tbe assignment was without any consideration whatever, and there is no evidence in tbe case contradicting him in this. Can tbe assignment, however, be aided by assuming that it was in consideration of tbe release of Lawrence from a liability for negligence ? If Lawrence was released from liability before be was damnified, bow can tbe mortgage be made available ?
An attempt is made to extricate the case from this difficulty, by placing tbe complainants’ claim upon tbe ground of subrogation. But bow can that be sustained ? Subrogation is not created by assignment. It originates from a rule of equity, and is applicable only in case of tbe relation of creditor and debtor, or principal and surety, and co-sureties. It is tbe substitution of a new for an old creditor; and it is tbe succession of tbe former to tbe latter’s rights which is called subrogation. Miller v. Ord, 2 Binn. Rep. 382; Neimcwicz v. Gohn, 3 Paige Rep. 614. It is founded on an equitable principle, growing out of tbe relative position of tbe parties, and arising ex contractu. Tbe doctrine of subrogation has no, application to liabilities ex delicto. And tbe substitution can, of course, give tbe new creditor no greater rights than actually belonged to tbe person who is succeeded. So that, even if tbe doctrine of subrogation were applicable here, wbat right bad Lawrence to enforce the indemnity mortgage against Clarkson, when be bad not only not been damnified, but bad, in fact, not been charged witb any actual liability for negligence ?
Tbe doctrine of subrogation, which arises solely out of tbe relation and obligations of tbe parties sounding in *90 contract, is founded, not upon the idea of any specific lien, but upon the paramount equity of the beneficiary. And a creditor, through this equity, can never claim the security of his debtor’s surety, unless the right has already accrued to the surety to come upon it. Where, therefore, security be given to a surety, to indemnify him, and his liability has never become absolute, the creditor can never claim the security by subrogation. Hopewell et al. v. Bank of Cumberland; and Bank of Virginia v. Boisseau et al., 12 Leigh. Rep. 387; 1 Am. Lead. Cas. 121; Whitehead, v. Pick, 1 Kel. Rep. 141, 151. In the language of the court, in McCullum v. Hinchly, 9 Verm. Rep. 149, “the attempt, in this case, is rather ingenious than ingenuous.” “ It was never supposed that the surety should be compelled to stand as a mere stepping-stone between the creditor and the principal.” Now, apart from the claim to mere priority of specific lien, what pretense can exist for any superiority of equity in Grant & Stone over that of Ludlow, whose mortgage was taken to secure him for lending his name as an indorser for Clarkson to the bank, at the very time that Clarkson was struggling to fulfill his engagements with Grant & Stone; and whose property had been actually levied upon to satisfy the judgment recovered by the bank on his liability as indorser ? Ludlow had been actually damnified, his mortgage had become absolute, and his claim rests upon the superior equities of a surety; while the claim of Grant & Stone is one sounding in tort, growing out of a hazardous commercial adventure, and never ascertained or fixed by adjudication. And this they seek to enforce through Lawrence, who did not stand in the position of a surety for Clarkson, who was never damnified, nor even requested, and now never can be required, to pay a single dollar on account of the occasion of his indemnity, and whose mortgage had not, therefore, and now never can become absolute. And this claim to subrogation, and a superiority of equity over Ludlow’s estate, is predicated on an assignment of Lawrence’s mortgage, made *91 without consideration! If this arrangement could give Grant & Stone any claim whatever founded in equity, it could not be set up against Ludlow, and would be inferior to his equity.
The case of Hayden v. Smith, 12 Metc. Rep. 511, is cited as supporting the decision of this case. I do not understand that case (although the opinion of the case is vague, indefinite, and unsatisfactory,) as intended to overrule the well settled law touching the operative effect of indemnity mortgages, designed for the exclusive or personal benefit of the mortgagee. Besides, that case is not analogous to this, but distinguishable in sundry material features, as follows:
1st. That was' the case of a surety on a note, holding a mortgage from -his principal, and who, after the note fell due, and the principal had become insolvent, assigned his interest in the mortgage premises to the payee of the note, and put him in peaceable possession of the land for a foreclosure.
2d. The plaintiff, as the purchaser of the mortgagor’s equity of redemption under a subsequent mortgage, and the assignee of another subsequent mortgage which recited the existence of the prior mortgage assigned to defendant, sought by his bill to cancel and set aside the defendant’s mortgage on the ground that it had been released by the assignment to the defendant.
3d. The case was one of hardship, in which, as it appears, the plaintiff sought to acquire an unjust and inequitable advantage, by attempting to defeat the defendant’s only security for a debt arising out of a loan of money, and to acquire a large and valuable estate worth $20,000 for a wholly inadequate consideration. The case is peculiar in itself, unsupported by authority, and, so far as it affects the general rules of the law, is an illustration of the saying, “ that hard cases sometimes make bad precedents.”
4th. But all that was decided by the case was, that the note toas not discharged, nor the mortgage canceled, by the,assignment of the surety to the payee of the note, and that the plain *92 tiff' could not redeem without payment of the prior incumbrance.
5th. In that case, no question could have been raised as to the liability of the assignor, as it was that of a surety on a note, and it appeared that all the subsequent incumbrancers well understood the surety’s mortgage to be a prior lien on the property to secure an unquestionable contract liability.
6th. The court in that case did not decree a foreclosure in favor of the surety, but simply left the mortgage to stand as an incumbrance on the land, refusing a right of redemption, and declaring that it was not released and the liability of the surety discharged, by the assignment of the mortgage to the holder of the note; in other words, the court, in effect, held that the assignment of the mortgage was a, vain and inoperative act.
I leave that case, therefore, with this additional remark, that it clearly does not settle any leading principle, and most certainly does not unsettle old and well established principles; and in neither event, as I must say with all due deference, does it bear, when accurately considered, any strict analogy to the case before us.
There are several other points involved in this case, upon which I find myself unable- to concur in the views of the majority of the court. These I will briefly notice, without taking time to discuss them.
1st. The principle is unquestionable 'that all the parties to the original decree, or their legal representatives, ought to be joined, and before the court, before a decree of reversal on bill of review. Bank of the U. S. v. White, 8 Pet. Rep. 267; and Sturges et al. v. Longworth, 1 Ohio St. Rep. 545, 560. All the parties to the original decree, in this case, are not before us, either by due process or voluntary appearance. Among others, the personal representative of Lawrence, not before us, is a necessary party. The mortgage, if operative, passed the legal title in the *93 premises to Lawrence, which., in case of decree for complainants, should he divested. Besides, the complainants cannot, as it is conceded, have a decree without establishing a liability for negligence against Lawrence. And furthermore, the whole claim of the complainants to relief is predicated on the equities of Lawrence, and can only be asserted through him.
Again, it is a rule of chancery practice, that if any person, not a party to the original suit, becomes interested in the subject matter, he must be made a party to the bill of review by way of supplement. Mitf. PI. 88, 90. Adams’s Eq. 418.
According to Story’s Equity, sec. 77: “If complete justice between the parties before the court cannot be done without other parties being made, whose rights or interests would be jeopardized by a decree, then the court will altogether stay its proceedings, even though the other parties cannot be brought before the court; for, in such case, the court will not, by its endeavors to do justice between the parties before it, risk the doing of positive injustice to other persons not before it, whose claims are or may be equally meritorious.”
Adams on Equity, in the chapter on parties, 312, says: “In equity, a decree is asked, and not a decision only; and it is, therefore, requisite that all persons should be before the court whose interests may be affected by the proposed decree, or whose concurrence is necessary to a complete arrangement.”
2 Madd. Ch. 174-8; 1 Danl. Ch. 266-9. “All persons interested in mortgage money should be made parties.” 3 Danl. 1725.
2d. The case being before us on bill of review reserved in the district court for decision here, does not stand for final decision on the merits of the original case. After reversal of the decree below, the case might perhaps be retained here for final decree by the consent of the parties, but not otherwise. The case is made by the bill of review. *94 It involves the question whether there be error in the original decree or not. It brings within our jurisdiction, the question of the reversal of the original decree for error — nothing more. Our whole power and jurisdiction over this case is derived from the fifth section of the statute relating to the organization of courts of justice, and their powers and duties; which provides that, “whenever any important or difficult question shall arise in any proceeding pending before the district court in any county, the judges of the district court, or the judges of the Supreme Court, sitting in said district court, may, on motion of either party, cause the same to be reserved and sent to the Supreme Court for its decision; and all other questions as to which the judges of the district court may be equally divided in opinion, shall, on motion of either party, in like manner, be reserved and sent to the Supreme Court for determination.” Now, the case before us is here, and within our authority as an appellate court, solely and alone wpon the questions involved in the case as reserved, which are the questions of error in the original decree. Beyond this we can have no jurisdiction; and in case of a reversal of the original decree, the case, in my opinion, should be remanded to the district court of the county for proceedings in the original case. This has been the general, if not the invariable practice heretofore in this state, and is in accordance with the practice of the supreme court of the United States in reference to cases taken up from the circuit courts. And there is an especial propriety in this practice in this case, inasmuch as it is necessary to make additional parties, and also to have a reference to a master to state an account touching matters connected with the extent of Lawrence’s liability, or the amount of the damages, if he be liable at all, before a final decree, in the original case, can be rendered properly in favor of the complainants in review.
3d. I differ essentially with the majority of the court, in case Lawrence be liable for negligence, touching the *95 extent of Ms liaMlity and the rule of damages. Lawrence cannot, in my opinion, he held responsible as a surety for Clarkson upon any known principle of law. If liable at all, his liability is that of an agent for Grant & Stone, and not that of a surety for Clarkson.
In case of negligence in the conduct of an agent, the rule of damages is limited to the proximate actual loss resulting from the misfeasance or nonfeasance; and the principal is not entitled to recover for remote contingent or probable losses. Story on Agency, sec. 222. The security which Lawrence was required to take was for advances based on anticipated consignments of bacon to he sold in the spring of 1839, and also for commissions and interest. Now, the just rule of damages would be the difference between the amount of the advances, commissions and interest at the stipulated time for the sale of the article, and the value of the bacon received, according to the market price in Philadelphia at that time. And upon this Lawrence would be justly entitled to a deduction at least for the $8,000, which Grant & Stone actually realized out of the security subsequently taken by Mm for them.
But, on the supposition that Lawrence did actually assent to the extension of the time for the sale of the bacon, (of which there is no proof,) and that such extension left him, as to his liability for negligence, in the situation he would have been in had no time been specified for the sale of the bacon, what then would have been the rule of damages ? Lawrence’s liability, on this supposition, accrued in 1839, and the extent of the proximate actual loss can be correctly estimated only by a reference to the posture of affairs at the time when the misfeasance was fully consummated. Upon no principle of law can Lawrence be held liable for the consequences arising from the unexpected fall in the prices of real estate in and about Cincinnati, which took place after the supposed liability accrued, and chiefly, as it appears, in 1841, 1842, and the beginning of *96 1843. He was required to take and hold real estate as security to the amount of $30,000, no more. If he had taken security for more than this amount, and afterward given it up, and again taken other security equal to the amount required, Grant & Stone could have had no ground for complaint, for they never prescribed the form or manner in which he should hold this security for them. There was no vigilance enjoined upon Lawrence requiring of him the duty, in taking the security, to anticipate the unexpected fall in the price of real estate. And it appears that Grant & Stone ratified Lawrence’s acts in taking the, subsequent security by availing themselves of its benefit. Now, upon the supposition mentioned, the fair rule of damages would be the excess of the amount of the advances, commissions and interest over and above the amount realized from the sales of the bacon and the amount of the secuiity obtained by the mortgage on the pork house and country seat, estimating them at their actual value when taken in 1839.
The complainants could not, after delaying the sales of the bacon for higher prices, and. giving Clarkson an extension of three years credit on the balance coming to them, by such delay justly increase the damages upon Lawrence to thé* extent of the unforeseen fall in prices of •the real estate security. And I know of no principle by which the damages can be increased in consequence of the amounts paid by Grant & Stone for insurance, for premiums on the renewals of the loans obtained on their own acceptances, and for freight on the transmission of the bacon to Philadelphia, and the reshipment of it in part to other markets. These may be very proper charges against Clarkson. But Lawrence was required to take security for the advances, commissions and interest, nothing more; and these were based on the anticipated consignments of the bacon. It appears to me to be an unwarranted burden upon Lawrence’s liability to swell *97 the amount against him by charges not anticipated and for which he was not required to take security.
And I cannot concur in the conclusion that Lawrence is bound, and much less that Ludlow’s heirs are bound, by the settlement made between Clarkson and Grant, in October, 1840, affixing and ascertaining the amount of the damages against Lawrence. Neither Lawrence nor Ludlow was a party to that settlement, and neither of them participated in making it. Besides, Clarkson was chargeable with items for which Lawrence was not required to take security, and therefore could not be made responsible.
And in rendering a decree for the complainants, I am wholly unable to perceive how equity can be properly done between the parties, without a reference to a master to take and state an account touching sundry matters proper to be taken into consideration, in ascertaining the amount of the damages against Lawrence, which must determine the amount of the decree.
The importance of this case, and the great injustice which, in my judgment, is done by the decision, must furnish the excuse, if excuse be necessary, for the patient and elaborate examination that I have given the case in my dissent. My conclusions are deduced from uncontroverted and incontrovertible facts, shown by the testimony, exhibits and pleadings in the case. If I have erred, the error is in my reasoning or conclusions, and not in any assumption of fact unwarranted by the proof.